UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KHALID MOHAMMAD, individually, and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, PROGRESS SOFTWARE CORPORATION, and IPSWITCH, INC.,<br><br>　　　　Defendants. | Case No. |

## **CLASS ACTION COMPLAINT**

Plaintiff Khalid Mohammad ("Plaintiff"), on behalf of himself and all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against International Business Machines Corporation ("IBM"), Progress Software Corporation ("PSC"), and Ipswitch, Inc. ("Ipswitch") (collectively, "Defendants") and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters, as follows.

## **INTRODUCTION**

1.　　Plaintiff brings this class action against Defendants for their failure to secure and safeguard his and approximately 4,091,794 other similarly situated individuals' personally identifiable information ("PII") and personal health information ("PHI"), including but not limited to names, Social Security numbers, Medicaid ID numbers, Medicare ID numbers, dates of birth, home addresses and other contact information, demographic or income information, clinical and medical information (such as diagnosis/condition, lab results, medication, or other treatment information), and health insurance information.

2.      IBM is a multinational technology company which is headquartered in New York. IBM provides services to the Colorado Department of Health Care Policy and Financing ("HCPF"), which is a department in the Colorado state government that administers Colorado's Medicaid program, the  Child Health Plan Plus, and other health care  programs. HCPF provides IBM with PII/PHI of its customers. IBM transferred HCPF's customers' PII/PHI through Ipswitch and PSC's MOVEit Transfer software. Plaintiff's and Class members' PII/PHI was disclosed to unauthorized third parties during a massive data breach compromising the MOVEit Transfer and MOVEit Cloud ("MOVEit") software that occurred between approximately May 30, 2023, and May 31, 2023 (the "Data Breach").

3.      During the Data Breach, and due to Defendants' data security and privacy shortcomings, unauthorized persons were able to gain access to files containing the PII/PHI of HCPF's customers by exploiting a vulnerability in the MOVEit platform.

4.      Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security measures and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all of HCPF's customers whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### Plaintiff Khalid Mohammad

7. Plaintiff Khalid Mohammad is a citizen of Colorado.

8. Plaintiff was required to provide his PII/PHI to HCPF in connection with obtaining insurance or other services.

9. Plaintiff believed that HCPF had implemented and maintained reasonable security and practices to protect his PII/PHI, including ensuring third parties it contracts with and shares PII/PHI with maintain adequate data security and practices.

10. In connection with providing services to HCPF, IBM collected, maintained, and shared Plaintiff's PII/PHI on its systems.

11. Had Plaintiff known that Defendants do not adequately protect the PII/PHI in their possession, including IBM by not ensuring that the third parties they contract with maintain adequate data security systems and practices, he would not have agreed to provide his PII/PHI to HCPF.

12. Plaintiff received a letter from HCPF notifying him that his PII/PHI was exposed in the Data Breach.

13. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*: a substantial and imminent risk of identity theft; the wrongful disclosure and

loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and overpayment for services that did not include adequate data security.

***Defendant International Business Machines Corporation***

14.    Defendant International Business Machines Corporation is a New York corporation with its principal place of business located at One New Orchard Road, Armonk, NY 10504.

***Defendant Progress Software Corporation***

15.    Defendant Progress Software Corporation is a Delaware corporation with a principal place of business located at 15 Wayside Road, Suite 4, Burlington, MA 01803.

***Defendant Ipswitch, Inc.***

16.    Defendant Ipswitch, Inc. is a Massachusetts for profit corporation with its principal place of business located at 15 Wayside Road, 4th Floor, Burlington, MA 01803.

## JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

18.    The Court has personal jurisdiction over Defendant IBM because it transacts significant business in Massachusetts, and otherwise has sufficient minimum contacts with and intentionally avails itself of the market in Massachusetts through its promotion, marketing, and sale of products and services.

19.    The Court has personal jurisdiction over Defendants Ipswitch, Inc. and Progress Software Corporation because they have their principal places of business in Massachusetts and conduct significant business in Massachusetts.

20.     Venue properly lies in this judicial district because, *inter alia,* Ipswitch and PSC's principal places of business are located in this District, Defendants transact substantial business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Ipswitch, Inc., Progress Software, and the Unsecure MOVEit Software*

21.     Ipswitch is an IT software development company founded in 1991 in Burlington, Massachusetts. Ipswitch sells its software and related products and services, including MOVEit solutions, directly and through resellers and distributors in the United States.

22.     Defendant PSC, a public domestic software company based in Massachusetts, acquired Ipswitch in May 2019 for approximately $225 million.

23.     Ipswitch developed and through PSC sells the MOVEit software, which they claim is "the leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities."[1]

24.     On their websites, Defendants Ipswitch and PSC make a host of claims about data security and their MOVEit product. Ipswitch claims, generally, that its "Enterprise File Transfer Solutions – Mak[e] the networked world a safer place."[2] Its website states: "Our efficient, easy-to-use products empower customers to respond faster to business demands through accelerated implementation and improved productivity and security."[3]

25.     Specific to MOVEit, Ipswitch claims that "MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the

---

[1] *MOVEit*, IPSWITCH, https://www.ipswitch.com/moveit (last accessed Sep. 1, 2023).
[2] *Ipswitch.com*, IPSWITCH, https://www.ipswitch.com (last accessed Sep. 1, 2023).
[3] *Id.*

transfer of sensitive data between partners, customers, users and systems." [4] Ipswitch claims its MOVEit Transfer and MOVEit Cloud products give customers "control" over their businesses; "provides full security, reliability and compliance"; provide "encryption, security, activity tracking tamper-evident logging, and centralized access controls to meet your operational requirements"; "[r]eliably and easily comply with SLAs, internal governance requirements and regulations like PCI, HIPAA, CCPA/CPRA and GDPR"; and provide "secure and managed file transfer."[5]

26.    PSC makes similar statements about data security. Its website claims "MOVEit provides secure collaboration and automated file transfers of sensitive data" and that it provides "[e]ncryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[6]

27.    PSC also touts all of the following on its website regarding MOVEit:[7]

# Securely Share Files Across the Enterprise and Globally

Reduce the risk of data loss and non-compliance with a fully-auditable and managed file transfer solution. Extend file transfer capabilities to all users to eliminate insecure use of email and quickly onboard partners and third-parties. Easily create automated file transfer tasks and workflows to accelerate your business and eliminate the risk of user error. Track and report on every single transfer.

✓ **Transfer Sensitive Information Securely**

Encryption in-transit and at-rest and advanced security features keep sensitive information out of harm's way.

✓ **Assure Regulatory Compliance**

Easily implement security controls and establish an audit trail.

✓ **Let End Users Collaborate Securely**

Easily ensure secure and compliant sharing of sensitive data for all users.

✓ **Accelerate Task and Workflow Creation**

Enable your team with programming-free automation of multi-step, logic-based workflows.

---

[4] *See MOVEit*, *supra* note 1.
[5] *Id.*
[6] *MOVEit*, PSC, https://www.progress.com/moveit (last accessed Sep. 1, 2023).
[7] *Id.*

28.     As demonstrated above, Defendants Ipswitch and PSC heavily tout and promote the MOVEit products and services as capable of safely transferring sensitive information. Despite these assurances and claims, Defendants Ipswitch and PSC failed to offer safe and secure file transfer products and failed to adequately protect Plaintiff's and Class members' PII/PHI.

29.     This is because the products that Defendants Ipswitch and PSC offered, and which IBM used, were not secure. When the Data Breach occurred, there was a critical vulnerability in the MOVEit software referred to as CVE-2023-34362. Specifically, Defendants Ipswitch and PSC identified that MOVEit's web-based front end is affected by a critical structured query language (SQL) injection vulnerability/attack vector that can be exploited by an unauthenticated attacker to access databases associated with the product.

30.     All of the Defendants knew or should have known that MOVEit leaves the PII/PHI of HCPF's customers, including Plaintiff and Class members, exposed to security threats. Despite this, Ipswitch and PSC continued to offer MOVEit file transfer products without adequately testing and identifying the vulnerabilities in the products, and patching or otherwise eliminating those threats.

31.     Similarly, IBM continued to use the MOVEit software without adequately ensuring it was secure and that Ipswitch and PSC had adequate data security systems and practices in place to protect Plaintiff and Class members' PII/PHI. As one cybersecurity company noted, "Just because a piece of software claims to be 'secure' doesn't mean that it is. Customers must always

validate that the software they use is secure and is configured in a way that can protect against cyberattacks."[8]

### IBM

32.     IBM is a multinational corporation that generated $60.5 billion in revenue in 2022.[9] The company claims to "bring together all the necessary technology to help [its] clients solve their business problems."[10]

33.     IBM maintains a privacy policy on its website that states, "At IBM we value your privacy and are committed to protecting and processing your personal information responsibly."[11] IBM's privacy policy goes on to state, "To protect your personal information from unauthorized access, use, and disclosure, we implement reasonable physical, administrative, and technical safeguards," and "[w]e also require our Business Partners, suppliers, and third parties to implement appropriate safeguards, such as contract terms and access restrictions, to protect information from unauthorized access, use, and disclosure."[12]

34.     IBM shared the PII/PHI of HCPF's customers with Ipswitch and PSC via the MOVEit software in connection with providing services to Plaintiff and Class members.[13] In doing

---

[8] Avishai Avivi, *MOVEit Vulnerability: A Painful Reminder That Threat Actors Aren't the Only Ones Responsible for a Data Breach*, SAFEBREACH (June 21, 2023), https://www.safebreach.com/moveit-vulnerability-a-painful-reminder-that-threat-actors-arent-the-only-ones-responsible-for-a-data-breach/.

[9] *2022 IBM Annual Report*, IBM, https://www.ibm.com/annualreport/?lnk=flatitem (last accessed Nov. 29, 2023).

[10] *About IBM*, IBM, https://www.ibm.com/about?lnk=flathl (last accessed Nov. 29, 2023).

[11] *IBM Privacy Statement*, IBM, https://www.ibm.com/us-en/privacy (last accessed Nov. 29, 2023).

[12] *Id.*

[13] *See Notice of Data Event*, COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING, https://apps.web.maine.gov/online/aeviewer/ME/40/5b434968-ff60-47f4-ac52-fb7946cf3bc6/164900ab-0183-4480-a421-d767aea8d382/document.html (last accessed Nov. 29, 2023).

so, IBM failed to ensure that Ipswitch and PSC implemented and maintained adequate data security practices to protect Plaintiff's and Class member's PII/PHI from unauthorized access, disclosure, and theft.

### *The Data Breach*

35.    On or about May 31, 2023, unauthorized persons exploited a vulnerability in the MOVEit software to access and download files containing the sensitive PII/PHI of Plaintiff and Class members.[14]

36.    According to reports, the Clop (also known as CLOP or Cl0p) ransomware gang is responsible for the attack on the MOVEit platform.[15]

37.    HCPF's notice to Plaintiff and Class members states that information affected in the Data Breach includes "name, Social Security number, Medicaid ID number, Medicare ID number, date of birth, home address and other contact information, demographic or income information, clinical and medical information (such as diagnosis/condition, lab results, medication, or other treatment information), and health insurance information."[16]

38.    The Cybersecurity and Infrastructure Security Agency (CISA) and the FBI first warned on June 7, 2023, that the Clop ransomware gang was exploiting a vulnerability in MOVEit Transfer. "Internet-facing MOVEit Transfer web applications were infected with a specific

---

[14] *Id.*

[15] *See Clop Gang to Earn Over $75 Million from MOVEit Extortion Attacks*, Bleeping Computer (July 21, 2023, 12:34 PM), https://www.bleepingcomputer.com/news/security/clop-gang-to-earn-over-75-million-from-moveit-extortion-attacks/.

[16] *Notice of Data Event*, *supra*, n. 13.

malware used by CL0P, which was then used to steal data from underlying MOVEit Transfer databases," the advisory said, as it explained how threat actors carried out the attack.[17]

39.    A senior CISA officer informed reporters that "several hundred" businesses and organizations in the United States may be impacted by the hacking campaign in addition to government entities.[18]

40.    As a result of the MOVEit Data Breach, Plaintiff and Class members have had their sensitive PII/PHI exposed as a result of Ipswitch and PSC's unsecure MOVEit file transfer product being exploited by cyber criminals during the Data Breach, and because IBM failed to ensure the third parties it contracts with maintained adequate data security systems and practices.

### Defendants Knew that Criminals Target PII

41.    At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against.

42.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata

---

[17] Bruce Sussman, *Clop Ransomware and the MOVEit Cyberattack: What to Know*, BLACKBERRY BLOG (June 19, 2023), https://blogs.blackberry.com/en/2023/06/clop-ransomware-and-moveit-cyberattack.
[18] Onur Demirkol, *US Government Under Seige: MOVEit Breach Exposes Critical Data to Ruthless Clop Ransomware Attack*, DATA CONOMY (June 19, 2023), https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/ (last accessed Nov. 29, 2023).

breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were

caused by flaws in . . . systems either online or in stores."[19]

43.     Cyber criminals seek out PHI at a greater rate than other sources of personal

information. In a 2023 report, the healthcare compliance company Protenus found that there were

956 medical data breaches in 2022 with over 59 million patient records exposed.[20] This is an

increase from the 758 medical data breaches which exposed approximately 40 million records that

Protenus compiled in 2020.[21]

44.     PII/PHI is a valuable property right.[22] The value of PII/PHI as a commodity is

measurable.[23] "Firms are now able to attain significant market valuations by employing business

models predicated on the successful use of personal data within the existing legal and regulatory

frameworks."[24] American companies are estimated to have spent over $19 billion on acquiring

personal data of consumers in 2018.[25] It is so valuable to identity thieves that once PII has been

disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

[19] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[20] *See 2023 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last accessed Nov. 29, 2023).

[21] *See id*.

[22] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[23] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[24] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[25] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

45.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

46.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[26] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[27]

47.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[28] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[29]

---

[26] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[27] *Id.*

[28] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[29] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

48.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[30] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[31]

49.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[32]

50.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[30] Steager, *supra*, n. 26.

[31] *Id.*

[32] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

51.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[33][34]

52.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[35]

53.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[36]

54.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[33] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 29, 2023).
[34] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).
[35] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.
[36] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 29, 2023).

that can plague victims' medical and financial lives for years."[37] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[38] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [39] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[40]

55.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b.    Significant bills for medical goods and services neither sought nor received.

c.    Issues with insurance, co-pays, and insurance caps.

d.    Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[37] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[38] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra*, n. 29.
[39] *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 29, 2023).
[40] *Id.*

f.    As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgages or other loans and may experience other financial impacts.

g.    Phantom medical debt collection based on medical billing or other identity information.

h.    Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [41]

56.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[42]

### *Damages Sustained by Plaintiff and Class Members*

57.    Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

---

[41] *See* Dixon & Emerson, *supra*, n. 37.
[42] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

## CLASS ALLEGATIONS

58.     This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

59.     Plaintiff brings this action on his own behalf, and on behalf of the following Class of similarly situated persons:

> All persons whose personally identifiable information and personal health information was provided to the Colorado Department of Health Care Policy and Financing and IBM and was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

60.     Excluded from the Class are: (i) Defendant Ipswitch, Inc. and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (ii) Defendant Progress Software Corporation and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (iii) Defendant International Business Machines Corporation and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; and (iv) the judge(s) presiding over this matter and the clerks of said judge(s).

61.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62.     The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. HCPF has reported the number of persons affected by the Data Breach as 4,091,794 persons.[43]

---

[43] *See Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://apps.web.maine.gov/online/aeviewer/ME/40/5b434968-ff60-47f4-ac52-fb7946cf3bc6.shtml (last accessed Nov. 29, 2023).

63.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, inter alia:

    a.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure, including ensuring that the third parties it contracts with to provide services had adequate data security measures in place;

    b.    Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

    c.    Whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

    d.    Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

64.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

65.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

66.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial

experience and success in the prosecution of complex consumer protection class actions of this nature.

67.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE

68.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in their possession, custody, or control.

70.    Defendants knew or should have known the risks of collecting and storing Plaintiff's and Class members' PII/PHI and the importance of maintaining secure systems, including ensuring third party vendors employed adequate data security practices. Defendants knew or should have known that they faced an increased threat of customer data theft, as

judged by the many data breaches that have targeted companies that stored PII/PHI in recent years.

71.    Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they collect, store, and maintain, and the resources at their disposal, Defendants should have taken care to identify the vulnerabilities to their systems or to their third-party vendors' systems and prevented the Data Breach from occurring.

72.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

73.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

74.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

75.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members

have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) loss of value of the PII/PHI that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

76.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

77.    Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

78.    Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

79.    Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA, by failing to, or contracting with companies that failed to, use reasonable measures to

protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice of the Data Breach, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

80.    Defendants' violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

81.    Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

82.    The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Brach.

83.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

84.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of the HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

### COUNT III
### UNJUST ENRICHMENT

85.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86.     Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of their valuable PII/PHI and through money paid for services, a portion of which Plaintiff and Class members reasonably expected would be used to protect their PII/PHI.

87.     Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members by storing or transferring the PII/PHI, or otherwise using it to facilitate their business, and providing services to Plaintiff and Class members.

88.     As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the loss of value of Plaintiff's and Class members' PII/PHI. Plaintiff and Class members also suffered actual damages in an amount equal to the difference in

value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

89.    Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of the Class, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as class representative and undersigned counsel as class counsel;

B.    Award Plaintiff and Class members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C.    Award declaratory and injunctive relief as permitted by law or equity to assure that Plaintiff and Class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D.    Award Plaintiff and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Award Plaintiff and Class members such other favorable relief as allowable under law or at equity.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 30, 2023                    Respectfully submitted,

/s/ *David Pastor*
David Pastor (BBO # 391000)
**PASTOR LAW OFFICE PC**
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Tel: (617) 742-9700
Fax: (617) 742-9701
dpastor@pastorlawoffice.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: (312) 621-2000
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff and the Putative Class*

*pro hac vice forthcoming